Argued March 27, reversed and dismissed May 27, 1919.

# KIRCHOFF *v.* BERNSTEIN.

(181 Pac. 746.)

**Attorney and Client—Special Trust—Fair Dealing.**

1. The law requires that the conduct of an attorney, when dealing with his client, shall be characterized by fairness, honesty and good faith.

**Attorney and Client—Dealings—Burden of Proof.**

2. When a client challenges the fairness of a contract made with his attorney, the attorney has the burden of showing, not only that he used no undue influence, but also that he gave to his client all the information and advice which it would have been his duty to give, if he himself had not been interested, and that the transaction was as beneficial to the client as if the latter had dealt with a stranger.

**Attorney and Client—Contracts for Compensation.**

3. A client is ordinarily not entitled to relief from an agreement concerning compensation to be paid his attorney, unless he has suffered injury through an abuse of confidence on the part of the attorney.

[As to compensation of attorney, see note in Ann. Cas. 1916E, 249.]

**Executors and Administrators—Attorney's Fees—Amount.**

4. An attorney's fee of $3,500, allowed by the County Court for services rendered to executors of an estate worth $98,886, *held* reasonable.

**Attorney and Client—Accounting—Evidence.**

5. In an action for an accounting, by the administrator of a deceased beneficiary under another's will against attorneys who represented such beneficiary in procuring his share under the will, evidence *held* to show that defendants, in securing a compromise of a *bona fide* contest of the will, acted in good faith and in accordance with instructions from the beneficiary.

**Attorney and Client—Accounting—Evidence.**

6. In an action for an accounting, by an administrator of the estate of a beneficiary under another's will against attorneys who had represented such beneficiary in securing his share under the will, evidence *held* to show that the beneficiary was not deceived about defendants acting as attorneys for the executors of the will, as well as for such beneficiary.

**Attorney and Client—Value of Services—Services to Beneficiary of Estate.**

7. Where attorneys for a foreign beneficiary kept him informed of the proceedings in the estate, and appeared in and settled a *bona fide* con-

test of the will, and forwarded him his share, amounting to over $50,000, in an action by the beneficiary's administrator against such attorneys for an accounting, the contention that valuable services were not performed by defendants for the beneficiary individually, although they were also attorneys for the estate's executors, cannot be sustained, and for such services a fee of $3,500, which was approved by the beneficiary, was reasonable.

BENNETT, J., dissenting.

From Multnomah: GEORGE R. BAGLEY, Judge.

In Banc.

Daniel Kunkel died on January 17, 1914. He left an estate consisting of real and personal property of the aggregate value of $98,886.08. The real property embraced three lots located in Portland. Two of these lots were worth $25,000 and the third lot was valued at $4,500. The personal property included cash in bank amounting to $41,265.28, a secured promissory note which was worth $27,500, its face value, and other items amounting to $620.80.

Daniel Kunkel executed a will on December 2, 1912, by the terms of which he named Edward Schiller and Peter Wagner as executors; he devised one third of his real property to his wife Anna Kunkel; and the remainder of his estate he gave to his brother Samuel Kunkel who resided in Germany. On January 21, 1914, a petition was filed in the County Court of Multnomah County for the probate of the will and on January 24th, the court admitted it to probate. The defendants Alexander Bernstein and D. Solis Cohen, copartners as Bernstein & Cohen, became the attorneys for the executors.

Alexander Bernstein had for more than twenty years acted as attorney for Daniel Kunkel. During this period Bernstein drew several wills for him, including the one which was admitted to probate. When Bernstein prepared the will of December 2d,

Daniel Kunkel gave him the address of his brother and requested Bernstein, in case of his death, to communicate to his brother, Samuel Kunkel, the fact of his death. and the fact that the will named Samuel Kunkel as a beneficiary.. In compliance with the request of Daniel Kunkel the defendants, on January 17, 1914, addressed a letter to Samuel Kunkel, informing him of the death of his brother and that he was named in the will as one of the beneficiaries. The letter explained that the defendants were conveying this information in conformity with a request made by Daniel Kunkel at the, time of the execution of the will. Inclosed with the letter was an instrument which the defendants had prepared for the purpose of enabling Samuel Kunkel to appoint Alexander Bernstein as his attorney in fact. After referring to this instrument, the defendants, in their letter, requested Samuel Kunkel to execute the power of attorney and to secure the acknowledgment of the nearest American consul if he desired Alexander Bernstein to act as his attorney in fact. Under date of February 5, 1914, Samuel Kunkel acknowledged receipt of the letter of January 17th and a few days afterwards he forwarded the power of attorney to the defendants who received it on or about March 3d.

On August 5, 1914, Anna Kunkel commenced a contest against the will. Negotiations for a compromise of the contest resulted in a settlement under the terms of which Anna Kunkel received all the real property freed from encumbrances and all claims whatsoever and the sum of $1,500 for her attorneys; and the remainder of the estate, less taxes and expenses of administration, became the property of Samuel Kunkel.

The contest having been disposed of, the County Court, on November 18, 1914, approved the final ac-

count of the executors, including an item of $3,500 allowed as compensation for services rendered to the executors by their attorneys, the defendants. After paying all the claims against the estate, taxes and the expense of administration, there remained for Samuel Kunkel as his share of the estate, the sum of $27,589.02 in cash and also a secured promissory note for $27,500; and hence the aggregate value of his portion of the estate then remaining was $55,089.02 plus whatever interest may have been due on the note. Besides this aggregate amount of $55,089.02 distributed at the close of the administration of the estate the sum of $1,000 had been sent to Samuel Kunkel on May 7th, and consequently his portion of the estate amounted to $56,089.02.

When Anna Kunkel commenced the proceeding to contest the will, Frank C. Hesse, an attorney who had studied in Germany and possessed a thorough and accurate knowledge of the German language, was retained to assist the defendants. On November 19, 1914, the defendants wrote to Samuel Kunkel telling him that the final account of the executors had been approved and that Alexander Bernstein had received from the executors for Samuel Kunkel the sum of $27,589.02 in cash. This letter also informed Samuel Kunkel that "for the professional services of Messrs. Bernstein & Cohen which have been rendered for you to date" the defendants charged $3,500 and that "for Mr. Hesse's services" Alexander Bernstein had paid $1,000, leaving $20,089.02 in the hands of Alexander Bernstein, after deducting the further sum of $3,000, which the defendants remitted by means of a draft accompanying this letter. In explanation of the fact that only $3,000 was at this time remitted it is proper to say that in response to a letter written by the de-

fendants on October 1st, asking Samuel Kunkel to say "in what manner and how" he wished his money sent to him the latter, by a letter dated October 23d, directed Bernstein to send him "from $2,000 to $3,000 the same way as the first $1,000 and the rest not until after termination of the war." However, Samuel Kunkel subsequently changed his instructions and under date of November 26th, wrote to the defendants as follows:

"Regarding the cash money, I am very much tormented by the children, and therefore request you, after deduction of the advance and charges of every nature, and after you have deducted for yourself the further sum of $1,000 for a Christmas present, to send, in the same manner as the $1,000 draft theretofore remitted to me, in May, everything."

The directions concerning remittances were again altered by a letter dated December 14th, and the defendants were ordered to remit in small amounts and at intervals.

Samuel Kunkel died on July 12, 1915. In September, 1916, Fritz Kirchoff, who was at that time the consul in charge of the German consulate in Portland, Oregon, was appointed administrator of the estate of Samuel Kunkel, deceased; and afterwards, on January 27, 1917, Fritz Kirchoff, as such administrator, brought this suit against the defendants Alexander Bernstein and D. Solis Cohen for an accounting.

The complaint is drawn upon the theory that the legal services performed for the benefit of the executors of the estate were not reasonably worth more than $1,500, and that, therefore, for the reasons specified in the complaint the defendants should be required to pay back $7,500. The complaint avers that, with the intent to take a corrupt advantage of Samuel

Kunkel and for the purpose of placing himself in a position to charge and to collect excessive fees, the defendants, (a) represented to Samuel Kunkel that it was necessary and proper to employ them and to appoint Alexander Bernstein as his attorney in fact and solicited him to do so; (b) advised him "to have no communication with the resident American consul in Germany" concerning the estate; and (c) concealed from him "so long as they were able, the amount of said estate, and understated the amount" of the estate. It is also averred that after having learned of the death of his brother Daniel, Samuel Kunkel, who was a citizen and inhabitant of the Empire of Germany, communicated with the German consulate in Portland, Oregon, "for advice and for the protection of his interests"; that Samuel Kunkel was advised by the German consulate—

"that it would be wise not to intrust the representation of his interests in the matter of said estate to the defendants herein whose duties and interests, as attorneys for the executors and in the matter of attorneys' fees to be allowed for the transaction of the estate business for the executors, might conflict with the duties of the said defendants in the representation of the interests of the said Samuel Kunkel";

that Samuel Kunkel wrote to the defendants telling them of the advice given him by the consulate; that the defendants corruptly intending to take advantage of Samuel Kunkel and for the purpose of protecting their own rather than his interests wrote to Samuel Kunkel and "falsely represented to him that the object of the German consulate in giving said advice was to get charge of the said business in order to make for itself fees"; that Samuel Kunkel believed the representations of the defendants, left the defendants in charge of his business and interests in connec-

tion with the estate, and "took no other or further counsel in relation thereto."

The complaint recites that Anna Kunkel began the contest proceeding on August 5, 1914, and it is then alleged that the defendants immediately began urging a compromise by: (a) falsely advising Samuel Kunkel that even if Anna Kunkel lost the contest she would, during her lifetime, as the widow of Daniel Kunkel, be entitled to one half of the income from the two-thirds interest in the real property devised to Samuel Kunkel; (b) falsely advising him that the widow would be entitled to an allowance of $250 per month "so long as the estate should remain unsettled"; and (c) exaggerating, in divers ways, the dangers and difficulties of the will contest—

"whereas, in truth and in fact, the said defendants well knew that the said Daniel Kunkel was of sound and disposing mind and memory at the time he had made the said will, and that he had not acted in any wise under undue influence of the said Samuel Kunkel, or of any other person, and that the said contest was sham and pretended; and that by said representations, and not otherwise, the said Samuel Kunkel was induced and consented to a compromise of the said litigation * * ."

The complaint charges that $3,500 was an unreasonable fee for the services rendered by the defendants to the executors and in support of this charge the plaintiff attacks the compromise, claiming that the portion of the estate awarded to Anna Kunkel should have borne a part of the taxes and expenses of administration, and criticises the defendants for having consented to a compromise which provided for the payment of all the taxes and expenses of administration out of funds in the hands of the executors. In

further support of his attack upon the fee allowed by the County Court for legal services performed for the executors, the plaintiff says that there was a large amount of cash in bank, only a few claims of creditors, no proceedings for the sale of real property and no complications; and that the professional services rendered by the defendants were brief and simple in character and that $1,500 would have been a liberal allowance for those services.

The complaint assails the $3,500 fee which the defendants charged and retained out of Samuel Kunkel's share of the estate by alleging: (a) That defendants did not furnish Samuel Kunkel with a copy of the final account or of any of the accounts filed by the executors during the administration of the estate; (b) that the defendants responded to inquiries of Samuel Kunkel by furnishing him with "indefinite and uncertain statements in general terms as to the condition, amount and value of the properties of said estate"; (c) that the defendants concealed from Samuel Kunkel and never communicated to him the fact that they had received $3,500 for the services performed by them for the executors; and (d) that Samuel Kunkel was "very aged" and was broken in mind and health and that the defendants, in their correspondence with Samuel Kunkel, flattered and cajoled him and "misadvised him in order to bring about such proceedings as would be most to their own advantage"; and that thus the defendants secured the acquiescence of Samuel Kunkel in the deduction of $3,500 from the moneys which the defendants had received from the executors as Samuel Kunkel's share of the estate.

Besides denials of the accusatory allegations found in the complaint, the answer contains affirmative mat-

ter avowing the good faith of the defendants, proclaiming their honesty of purpose, asserting their loyalty to the interests of Samuel Kunkel, and asseverating that the fees charged and collected by them were fair, reasonable and just. All the communications between defendants and Samuel Kunkel were in writing and, for the purpose of explaining the charges made against the defendants, much of this correspondence is pleaded in and made a part of the answer.

The reply reinforces the complaint with denials, affirmative averments, and a recital of considerable of the correspondence between defendants and Samuel Kunkel.

The decree, from which the defendants appealed, declares that the plaintiff is entitled to recover $3,500 on the theory that the $3,500 retained out of Samuel Kunkel's share of the estate was kept by the defendants without making a full disclosure to him, and that the $3,500 allowance made by the probate court was intended to be and was in full settlement of all the services rendered for the executors and for Samuel Kunkel individually. There was no cross-appeal by the plaintiff and hence it may be inferred that he was satisfied with the decree of the Circuit Court.

REVERSED AND DISMISSED.

For appellants there was a brief over the names of *Mr. Alexander Bernstein, Mr. Martin L. Pipes, Mr. John M. Pipes* and *Mr. George A. Pipes,* with oral arguments by *Mr. Bernstein* and *Mr. Martin L. Pipes.*

For respondent there was a brief over the name of *Messrs. Veazie, McCourt & Veazie,* with oral arguments by *Mr. John McCourt* and *Mr. Arthur L. Veazie.*

HARRIS, J.—1-3. The rules which define the duties of an attorney when dealing with his client are well established. The relation between an attorney and client has always been treated as one of special trust and confidence; and for that reason the law requires that the conduct of an attorney, when dealing with his client, shall be characterized by fairness, honesty and good faith. Indeed, so strict is the injunction not to take advantage of the client, that when a client challenges the fairness of a contract made with his attorney the latter has the burden of showing not only that he used no undue influence, but also that he gave to his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been if the latter had dealt with a stranger. The attorney, however, has a right to contract with his client for his compensation, and while courts will closely scrutinize a contract which a client claims to have been brought about by fraud or by undue advantage nevertheless a contract between an attorney and client will be upheld when it appears to be fair and honest. Stated in broad terms, the client ordinarily is not entitled to relief from an agreement concerning compensation to be paid to his attorney unless he has suffered injury through an abuse of confidence on the part of the attorney: *Hamilton* v. *Holmes,* 48 Or. 453, 459 (87 Pac. 154); *Phipps* v. *Willis,* 53 Or. 190, 194 (96 Pac. 866, 99 Pac. 935, 18 Ann. Cas. 119); 6 C. J. 686.

It must be remembered, however, that the value of services performed by an attorney cannot always be measured with the same decree of exactitude as can a bushel of wheat or a ton of coal. Education, experience, skill, judgment and knowledge are impor-

tant factors.   Nor can a just appraisal be placed upon the worth of professional services if the time actually employed in the rendition of those services is taken as the sole gauge.   An experienced and trained attorney might accomplish in a very short time what another could not do in a much longer time, or perchance might not be able to do at all.   The responsibility involved is always a considerable item and ordinarily the greater the amount involved the greater the responsibility.

Attention will now be directed to the evidence for the purpose of determining whether the conduct of the defendants measured up to or fell short of the high standard fixed for attorneys when dealing with their clients.   Letters written by the defendants and by Samuel Kunkel and by others form a large part of the record, and it will, of course, be impracticable to recite more than occasional excerpts from such correspondence or to record more than some of the most important facts disclosed by the testimony of witnesses.

The fee paid to Frank C. Hesse and the Christmas present given to the defendants may first be eliminated from the discussion.   On August 5, 1914, the defendants wrote a lengthy letter to Samuel Kunkel, informing him that Anna Kunkel had commenced a proceeding to contest the will.   This letter advised Samuel Kunkel that the defendants had "retained the professional service" of Frank C. Hesse, an attorney and a German scholar, "who should on account of his complete knowledge of the German language, be of great service to you."   The letter explains that Mr. Hesse

"was born at Leipzig, studied at Leipzig, Hallee in Paris, and because of correspondence between you

and your brother would be drawn in question, his services as interpreter and expert will be indispensable, likewise would his services as attorney be of great assistance.''

Under date of August 28th, Samuel Kunkel replied, saying: ''Regarding the lawsuit. It is very good that you took Mr. Hesse to your assistance''; and, again, on September 15th Samuel Kunkel wrote the defendants saying: ''I also approve of the employment of Mr. Hesse whom you took as an assistant.'' On November 19th the defendants wrote to Samuel Kunkel, advising him that ''for Mr. Hesse's services I disbursed the sum of $1,000, for which I hold receipt.'' Samuel Kunkel acknowledged receipt of the letter which the defendants had written on November 19th, and while he made no specific mention of the disbursement to Hesse he must be deemed to have approved it for the reason that he stated: ''With your balance I am completely agreed and satisfied.'' On November 26th, Samuel Kunkel addressed to the defendants a letter which contains the following:

''Regarding the cash money. I am very much tormented by the children, and therefore request you after deduction of the advance and charges of every nature, and after you have deducted for yourself the further sum of $1,000 for a Christmas present, to send in the same manner as the $1,000 draft heretofore remitted to me, everything.''

The propriety of the employment of Mr. Hesse cannot be seriously questioned, especially in view of the fact that Samuel Kunkel was fully informed concerning the reasons for the employment and, with full knowledge of all the facts, approved not only the payment of a fee but also the amount actually paid. Moreover, in his first letter to the defendants under

date of February 5, 1914, Samuel Kunkel requested them to "correspond in German, as I have difficulty to understand the English language." The money which was paid to Hesse was paid for services which he himself performed and not for services rendered by the defendants and hence the money paid to Hesse should not be taken into account or charged against the defendants when ascertaining how much they were entitled to ask for their services.

The Christmas present was a voluntary gift. Samuel Kunkel knew what he was doing when he gave the defendants this Christmas present and there is no adequate reason suggested in the record for compelling the defendants to return the gift. The amount of this gift must be left out of the calculation when figuring the compensation which the defendants were entitled to ask for their services. If the Christmas present, either in whole or in part, is taken into consideration when calculating the amount which the defendants were reasonably entitled to charge for their services then to the extent that the Christmas present is so taken into consideration it ceases to be a gift, and from a Christmas present is transformed into compensation.

4. The fee which the County Court allowed for services rendered to the executors by the defendants was not an unreasonable allowance. That T. J. Cleeton, the judge to whom the final account was submitted, was temperamentally cautious and possibly overcareful when passing upon claims for attorneys' fees is evidenced by his testimony which reads as follows: "I think at least 70 per cent of the fees that I allowed were probably reduced from what the attorney asked for." Besides his experience as a practitioner Judge Cleeton had had several years of experience on the

bench. The following is an excerpt from his testimony:

"Ordinarily an estate of that size that proceeded without contest and in the usual way, the attorney's fees should be something like about twenty-five hundred dollars, from twenty-five hundred to three thousand dollars, and I estimated that to represent and provide a defense against a contest of an estate of that value it would be worth from five hundred to one thousand dollars, and I fixed the fee accordingly at thirty-five hundred dollars, which I thought was a reasonable fee."

Lionel R. Webster, who was a distinguished lawyer and had served on the bench for about fifteen years, including seven years as county judge of Multnomah County, gave it as his opinion that $3,500 or $4,000 would have been a reasonable allowance. W. M. Cake, who served as county judge of Multnomah County from 1898 to 1902 and who acted as an attorney for Anna Kunkel in the proceeding to contest the will, stated that $2,000 would have been a reasonable allowance if there had been no contest, and that if the services rendered to the executors in connection with the contest are also taken into account, $3,500 would be a reasonable fee. The compensation allowed by the probate court was not disproportionate to the compensation allowed in another large estate referred to in the record; and upon the whole the fee which was fixed for the services performed for the executors by the defendants was a moderate and reasonable sum.

The only question now remaining for consideration is whether the defendants were entitled to collect any fee at all from Samuel Kunkel, and, if they were, then whether the sum retained by them was excessive. Besides the allegations relating to the contest, it will be

recalled that the complaint avers that the defendants planned to charge and collect excessive fees and to take advantage of Samuel Kunkel by procuring a power of attorney from him, advising him not to communicate with the American consul in Germany, concealing the amount of the estate, representing that the German consulate in Oregon was trying to get the business in order to make for itself fees, failing to furnish copies of the accounts filed by the executors during the administration of the estate, responding to inquiries for definite facts with general and indefinite statements, failing to communicate to Samuel Kunkel the fact that the defendants had received $3,500 from the executors and taking advantage of the condition of Samuel Kunkel by cajoling and flattering him.

The defendants performed services for the executors; and they also performed services for Samuel Kunkel. The County Court possessed authority to allow the executors to pay the defendants for services rendered to the executors; but that tribunal was without power to allow the executors to pay the defendants for services rendered to Samuel Kunkel as an individual. The County Court exercised its conceded authority and made an allowance for services rendered to the executors; but that court did not pretend to allow the defendants compensation for services rendered to Samuel Kunkel as an individual. The allowance made by the County Court was for services rendered to the executors and to them only. The County Court considered only the services performed for the executors. The County Court had no jurisdiction over the private business of Samuel Kunkel. Moreover, the County Court neither exceeded nor attempted to exceed its jurisdiction; for when passing upon the final account of the executors the court con-

sidered only the value of the services performed by the defendants for the executors. The court neither knew nor inquired as to what services the defendants performed for Samuel Kunkel or as to the value of those services. The allowance made by the County Court was a reasonable allowance for services rendered to the executors; and since such an allowance could not have lawfully included and in fact did not include compensation for services rendered to Samuel Kunkel as an individual, we shall now confine our attention to a consideration of the fee which the defendants charged Samuel Kunkel.

The letter of January 17th was written by the defendants in compliance with the request which Daniel Kunkel had made on December 2, 1912, when he executed the will. The will was placed in a safety deposit box and neither of the defendants had seen the instrument since the date of its execution. When the defendants wrote this letter they were without assurance that they would be retained as attorneys for the executors; and while they probably hoped to be employed yet there was some reason for them to think that the executors would seek other attorneys, for the defendants had previously opposed one of the executors in litigation in which he had been interested.

In the letter of January 17th the defendants advised Samuel Kunkel to cause the American consul "to put his acknowledgment" on the power of attorney. On February 5th Samuel Kunkel wrote saying:

"I have communicated with the American consul and hope shortly to be able to send you the power of attorney."

And on February 23d the defendants acknowledged receipt of Samuel Kunkel's letter of February 2d, and, among other things, said:

"In our opinion you acted very judiciously in communicating with the American consul, inasmuch as his official attestations of legal documents are entitled to full faith and credit in all American courts and by all American officials.

"In our opinion it would not be wise for the best of your own interests to inform the American consul of the exact amount of your expected inheritance, since he will charge you a fee, which is based on a certain percentage of your inheritance. The larger the inheritance the larger his fee. Outside of a few official attestations, he cannot do anything for you in the matter and would charge you just the same a certain fixed percentage for his mediation. Your inheritance you will receive without his intervention, and for that reason it is useless to pay him a fee for nothing."

It may be that the defendants were misinformed as to the fees charged by the American consul. The defendants knew, however, that the German consulate in Oregon made a percentage charge on moneys collected and sent to Germany; and there is nothing to show that the defendants knew or believed that the fees charged by the American consul in Germany were other than as represented in their letter. Assuming that the fees charged by the American consul were in proportion to the amount of the inheritance then the advice given by the defendants was to the best interests of Samuel Kunkel.

In their letter of January 17th the defendants told Samuel Kunkel that Daniel Kunkel had requested them to advise Samuel Kunkel that he "would receive a substantial share of" Daniel's property; and in their letter of February 23d the defendants wrote as follows:

"In our opinion, your share ought to be worth about 200,000 marks."

While Samuel Kunkel's share of the estate amounted to more than 200,000 marks, yet it is apparent that the defendants were not attempting to do more than to give a conservative estimate, because they neither knew nor had any means of knowing at that time the exact amount of the claims which might be presented against the estate. Indeed, the attorneys for the German consulate, when called upon at some time prior to June to advise the consulate concerning the condition of the estate, were properly prudent and careful when they stated:

"There is a possibility that the estate will have to pay debts which are not known to us at the present."

It cannot, however, be seriously contended that Samuel Kunkel was deceived or misled as to the affairs of the estate or as to the value of the property. On February 21st Cake & Cake, as attorneys for Anna Kunkel, wrote to Samuel Kunkel and in their letter they informed him that the real estate was valued at "substantially $29,000," and that the personal property, consisting of notes, cash and stock, "was valued at substantially $75,000." Ida Kunkel, who resided in Germany and was the widow of a deceased nephew of Daniel Kunkel, wrote to the German consulate, and on April 11th Samuel Kunkel also wrote to the German consulate, inquiring about the condition of the estate of Daniel Kunkel; and Samuel Kunkel afterwards learned from the German consulate the exact condition of the estate as it appeared from the inventory and appraisement. On March 3d, the defendants sent to Samuel Kunkel copies of the will, one in German and one in English. On April 28th, the defendants wrote a letter to Samuel Kunkel explaining to him that they had fixed 200,000 marks as "a conservative estimate of your share of the in-

heritance." And again on July 2d the defendants wrote to Samuel Kunkel telling him that the value of the estate was $98,886.08 and that—

"you must deduct the costs of the administration of the estate as well as the inheritance taxes, yearly taxes, etc., etc., which sums are not yet known to us. Nevertheless, we believe that you may count with safety on your share amounting to at least two hundred thousand marks. For further explanations on this point we refer you to our former letters."

Samuel Kunkel knew the terms of the will; he knew what the estate consisted of; he knew the appraised value of the property owned by the estate; and consequently he was not and could not have been deceived either as to the property comprising the estate, or as to its value, or as to the worth of his share.

On June 15th Samuel Kunkel wrote to the defendants and with his communication he inclosed a copy of a letter which the attorneys for the German consulate had written to the consulate and which the latter had forwarded in response to inquiries previously made by Ida Kunkel and Samuel Kunkel. The letter received by Samuel Kunkel from the German consulate referred to the defendants and concluded thus:

"We do not consider it advisable for foreign heirs to intrust the representation of their interests to the same attorneys who are representing the executors, and with whom an accounting must be made, and who most probably are representing conflicting interests."

The communication of June 15th was acknowledged by the defendants on July 2d and in their letter they stated in substance, that Samuel Kunkel would be obliged to pay fees if his interests were placed in the hands of the German consulate and that the consulate was apparently interested in securing the busi-

ness on account of the fees which it would be entitled to charge. While not the slightest criticism can be placed upon the letter which Samuel Kunkel received through the German consulate, yet it is evident that the defendants treated the letter as an attempt to cause Samuel Kunkel to withdraw his business from the defendants; and viewing the letter in that light, they accordingly wrote to Samuel Kunkel on July 2d, as already explained. It may appropriately be said here that it is admitted by all the parties that fees would have been charged if the interests of Samuel Kunkel had been turned over to the German consulate.

5. As soon as the will was opened and its contents made known Anna Kunkel indicated her dissatisfaction with the terms of the instrument. She promptly consulted her attorneys, Cake & Cake, who wrote to Samuel Kunkel on February 21st and made it plain to him that he could expect the will to be contested by Anna Kunkel. On March 14th, Samuel Kunkel wrote to the defendants and inclosed a copy of the communication received by him from Cake & Cake. Samuel Kunkel was about 78 years old; his wife was sick; and apparently he was in need of funds because in one of his letters he speaks of himself as a pensioned teacher and complains because his government had not paid his pension. In this letter of March 14th Samuel Kunkel writes to the defendants thus:

"If in truth there can result a long and expensive litigation, which I prefer to avoid, it would be better to bring about a fair compromise, if the same is advantageous to me and if I do not lose much thereby, and I entreat you to have the goodness to exert yourself in my behalf with this end in mind. Inasmuch as I am two and a half years older than my deceased brother Daniel, there is a probability of my never living long enough to see the end of such a lawsuit.

Therefore, much depends upon putting me in the possession of my share as soon as possible. I assume that you have mailed already a copy of the last will, though I have not received the same as yet. Have the goodness to inform me of current developments and please take care that the matter is brought to a conclusion as rapid as possible, for I do not live in such easy financial circumstances as my deceased brother Daniel, and would like to enjoy at least a few of my old days.''

Under date of March 30th, the defendants acknowledged receipt of Samuel Kunkel's communication of March 14th and in this letter the defendants tell Samuel that in their opinion

''Mrs. Kunkel has not the slightest ground to overthrow the last will and testament of your deceased brother''; and ''though we have not the least doubt regarding a favorable ending of such a lawsuit, we must, on the other hand, admit that we cannot prevent Mrs. Kunkel from instituting such a contest. Furthermore, although you empower us in your Power of Attorney to compromise your interests if necessary, we would under no circumstances enter in such a compromise should we not be empowered to that effect by you expressly.''

On April 21st the defendants wrote to Samuel Kunkel as follows:

''Should you prefer not to listen to a compromise, but to insist upon your full rights, we shall act in accordance with your wishes in the matter. Should you, however, prefer to pay Mrs. Kunkel a certain amount in a compromise, in order to get the matter out of the way, and in order to put you in possession of your share of inheritance quicker, please give us an approximate idea of the maximum amount, or if you intrust the matter entirely to our judgment, please advise us forthwith of your intention and we shall then do for you whatever is within our power. If you were not so advanced in years, we would posi-

tively advise you not to listen to a compromise, but under the existing circumstances a sensible and not too expensive compromise would probably be the best for you; but we leave the matter entirely to you and shall act entirely according to your wishes.''

On May 8th Samuel Kunkel thanks the defendants for information regarding ''the incontestability of the testament.'' On August 5th the defendants advised Samuel Kunkel that negotiations for a compromise ''are still under way'' and that the defendants were of the opinion that a compromise could be effected whereby Anna Kunkel would receive the real property and Samuel Kunkel would receive

''all moneys remaining after payment of debts and claims against the estate, which ought to be approximately $25,000, as well as the mortgage for $27,500, which is as good as cash.''

On August 17th the defendants wrote to Samuel Kunkel that they were

''as positive as we can possibly be that a settlement as outlined to you before [referring to the letter of August 5th] can be brought about'';

and they closed their letter with a suggestion that he telegraph his answer. On August 28th Samuel Kunkel wrote to the defendants in reply to their letter of August 5th, saying:

''Since I was in full accord with your advice regarding the offer of compromise, I sent forthwith to the telegraph office. Unfortunately my telegram was on account of the war not accepted.''

Again in this letter Samuel Kunkel says:

''I express the hope that you may succeed to settle my affairs successfully.''

Not having heard from Samuel Kunkel the defendants on September 4th sent to him a copy of the an-

swer to the contest filed by them in his behalf ·as well as for the executors; and in this letter the defendants advised and indeed urged the acceptance of the compromise; but as appears from the excerpt taken from Samuel Kunkel's letter of August 28th, he had already forwarded his acceptance although it had not yet reached the defendants when they wrote their letter of September 4th.   On September 15th Samuel Kunkel wrote to the defendants in answer to their letter of August 17th, saying:

"No answer thereto is really necessary, since I can only repeat to-day what I wrote you already in my letter of August 31, [August 28th] that I accept the submitted compromise."

The contest, which Anna Kunkel began, was genuine. Anna Kunkel had lived with Daniel Kunkel for 25 years and had helped him to accumulate his fortune. There were no children.   Daniel Kunkel and his wife together with a niece of the former made a trip to Germany in 1911 and visited Samuel Kunkel and other relatives.   Anna Kunkel felt that during that trip she was "slighted" by her husband's relatives.   Daniel Kunkel used intoxicants to excess.   Shortly after returning to Portland, Daniel Kunkel expressed to Alexander Bernstein a desire to make another will and after some delay the instrument of December 2, 1914, was executed.   All the wills which the testator had made prior to that time gave at least some of the personal property to Anna Kunkel.   The will of December 2d, in reality, only gave her one tenth of the whole estate while the remainder went to the aged brother who had no unusual claims upon Daniel's bounty. Although the defendants, as attorneys for Samuel Kunkel, appeared to be confident of success in the event the contest against the will had been prosecuted

to the end and the attorneys for Anna Kunkel likewise seemed to have been very much encouraged over the prospects of finally breaking the will, yet it is not at all unlikely that by the time the compromise was made the attorneys for each litigant were just a little doubtful of the possible outcome of protracted litigation over the will. The defendants made it plain to Samuel Kunkel, it is true, that the litigation would be long-drawn out and they also suggested to him several contingencies, some of which might or might not have happened. Although the defendants caused a monthly allowance to be made for the widow, nevertheless they tried, but without success, to have the court cut off the allowance when Anna Kunkel commenced the contest against the will. The testimony of W. M. Cake is quite convincing that the contest was begun and maintained as a real lawsuit. Judge Cake vouched for the loyalty of the defendants to the cause of their client, when he testified that "Mr. Bernstein and Mr. Cohen got me down to the very lowest we would have possibly considered a settlement." Samuel Kunkel was at all times desirous of compromising, because he was old and wished to enjoy his "inheritance" before he died. The compromise enabled him to realize his desire. The defendants appear to have been earnest and faithful in their efforts to obtain the most that they possibly could for their client, Samuel Kunkel.

6. Samuel Kunkel was never deceived about the defendants being attorneys for the executors. As early as February 23d the defendants wrote to Samuel Kunkel, telling him:

"Messrs. Peter Wagner and Edward Schiller are named in the testament as the executors, on account of their intimate and long-standing friendship with

92 Or.—26

your deceased brother. Same have appointed us as their attorneys, and as a consequence we have been recognized as such by the County Court."

On April 20th Samuel Kunkel wrote to the defendants offering to sell to them his share of the estate for $50,000. On April 28th Samuel Kunkel was told that

"all debts of the deceased, as well as inheritance tax, state taxes, funeral costs, fees of the executors and attorneys' fees, costs of the monument, etc., must be paid"; and that "the fees of the executors and of their attorneys are determined by the court."

On May 7th the defendants acknowledged receipt of Samuel Kunkel's letter of April 20th, and said to him:

"Your offer to sell your share in the estate for $50,000 to us we have to decline with thanks. Since we deem it our duty to realize out of the estate as much for you as possible, and our position of trust prohibits us to make a personal profit on you, excepting attorneys' fees, which we are allowed by the County Court for the probating of the estate, and such fees which we shall charge you in establishing your share of inheritance and cashing the same."

The letter received from the German consul by Samuel Kunkel and referred to by him in his letter of July 2d to the defendants, advised him that the defendants were attorneys for the executors. In their letter of August 5th the defendants say to Samuel Kunkel:

"The executors lost no time to file the first report as required by law after the expiration of the six months' period, and the same shows expenditures in the amount of $3,357.93 for funeral expenses, doctor bills, etc., as well as unpaid claims in the amount of $1,950, payment of which the court ordered. This last amount does not include inheritance tax, state taxes, executors' fees, neither fees to be allowed to the at-

torneys of the executors for administration of the estate. Besides this the court authorized a $500 monument.''

On November 19th the defendants addressed a lengthy letter to Samuel Kunkel advising him of the confirmation of the final account and that they had received $27,600 (less certain specified costs) in cash together with the note for $27,500 as his share of the estate. In this letter they also state that ''for the professional services of Messrs. Bernstein & Cohen which have been rendered for you to date, I charge the sum of $3,500''; they refer to an inclosed draft for $3,000 and then say that there was left in their possession ''a balance of $20,089.02 at your disposal.'' On December 14th Samuel Kunkel acknowledged receipt of the letter of November 19th and said: ''With your balance I am completely agreed and satisfied.'' Thus it is seen that Samuel Kunkel was repeatedly told that the defendants were attorneys for the executors. This information came to him several times from the defendants and once from the German consulate. He was told also, in plain and understandable language, not only that the defendants would be paid a fee to be allowed by the probate court for services rendered for the executors but also that he himself would be expected to pay the defendants ''such fees which we shall charge you in establishing your share of inheritance and cashing the same.'' Samuel Kunkel was told three several times that the defendants were acting as attorneys for the executors: Twice by the defendants and once by the German consulate. In their letter of February 23d, which was the very next letter the defendants wrote after the one dated January 17th, they informed Samuel Kunkel that they had been selected as attorneys for the executors. On

May 7th the defendants again told Samuel Kunkel
that they were acting as attorneys for the executors.
In addition to the two letters received from the de-
fendants, Samuel Kunkel received one from the Ger-
man consulate telling him that the defendants were
attorneys for the executors; and the fact of such em-
ployment was emphasized and written in large letters
before the eyes of Samuel Kunkel when he was told
through the consulate:

"We do not consider it advisable for foreign heirs
to intrust the representation of their interests to the
same attorneys who are representing the executors."

Three different times the defendants advised Sam-
uel Kunkel that they would be paid for services ren-
dered by them to the executors: On April 28th, on
May 7th and on August 5th. Samuel Kunkel was
advised in unmistakable language that the defendants
would charge him a fee for services rendered to him
and in this same letter, which was dated May 7th, the
defendants told him that in addition to the fee which
they would charge him they would be paid a fee for
services performed for the executors and that the
latter fee would be fixed by the County Court. The
letter of May 7th tells Samuel Kunkel that the de-
fendants cannot "make a personal profit on you, ex-
cepting attorneys' fees, which we are allowed by the
County Court for the probating of the estate, and such
fees which we shall charge you in establishing your
share of inheritance and cashing the same." In this
letter of May 7th Samuel Kunkel was advised of two
things: (1) That the defendants would be paid a fee
to be fixed by the County Court for services rendered
to the executors; and (2) that the defendants would
charge Samuel Kunkel a fee, for they say "we shall
charge you."

It must be remembered that Samuel Kunkel was a teacher; he was not an ignorant or an uneducated man; he knew the meaning of words; and consequently since he was an educated man with a thorough understanding of the German language we must presume that he understood the meaning of the words found in the letters received by him. With the exception of the letter of January 17th, all the letters signed by the defendants were written in the German language and consequently we must assume that Samuel Kunkel understood the letters which told him in the plainest language that the defendants were attorneys for the executors and that they would be paid a fee to be fixed by the County Court for the services performed for the executors and that the defendants would also charge Samuel Kunkel a fee for services performed for him. To say that Samuel Kunkel did not know that the defendants were attorneys for the executors or that he did not know that the defendants were to be paid for services rendered by them for the executors or that he did not know that the defendants expected to charge him for services to be rendered for him individually is to say that Samuel Kunkel did not know the meaning of plain and unambiguous words. When the defendants made known to Samuel Kunkel the amount of their bill he had been previously informed that the defendants were attorneys for the executors and that they would be paid for such services a fee to be allowed by the County Court; and Samuel Kunkel approved the bill, rendered by the defendants, with this knowledge and also with a knowledge of the property owned by the estate, the value of it, the amount of the moneys disbursed by the executors, and the net value of his "inheritance." He continued to correspond regularly with

the defendants up until the time of his death and in none of his letters, following his approval by the letter of November 19th, is there to be found the least suggestion or intimation of dissatisfaction; but upon the contrary Samuel Kunkel's letters manifest his unreserved and complete approval of the fee which the defendants charged him. Some attorneys might have sent to Samuel Kunkel complete copies of every paper filed in the estate, while other equally reputable attorneys might not have done so. Viewing the transactions in the retrospect and in the light of what has subsequently occurred, it can, of course, now be said that it would have been more prudent if complete copies of all papers had been prepared and mailed to Samuel Kunkel.

7. It is true that it was the duty of the executors to support the will and it is likewise true that it was to the interest of Samuel Kunkel that the will be sustained; and hence in that particular there was a unity rather than a conflict of interest between the executors and Samuel Kunkel. The only possible conflict of interest that could have arisen was when the county judge fixed the attorneys' fees for services rendered to the executors; but Samuel Kunkel knew that the defendants were to be paid a fee to be fixed by the court and Kunkel had a right to consent to it, as he did.

Samuel Kunkel was a necessary party to a settlement of the contest: 40 Cyc. 1262. If the will stood he received nine tenths of all the property of the testator. If the will had been broken then he lost all. The executors could not without his consent make a settlement of the contest which would take from him his interest in the real property and transfer it to Anna Kunkel. His approval of the compromise was

necessary. In view of the fact that Samuel Kunkel was the only person who could be affected by a compromise, which decreased his share of the estate and correspondingly increased the portion of Anna Kunkel, it can readily be seen that there was much room for the rendition of services which were peculiarly personal to Samuel Kunkel alone. The services rendered by the defendants were assuredly of value to Samuel Kunkel. Indeed, if he had turned his interests over to the German consulate he would have been required, and properly so, to pay for the services performed for him in looking after his interests; and, furthermore, it appears from the evidence in the record that the fees which the consulate would have charged for its services and for the services of its attorneys probably would have aggregated about $3,900. In other words, in addition to whatever fees might have been paid out of the estate to the attorneys for the executors, Samuel Kunkel would have been required to pay fees for services rendered for him individually if he had turned his business over to the German consulate. It cannot fairly be said that no valuable service was performed by the defendants for Samuel Kunkel individually. If the measure which was used by the German consulate in like cases is adopted as the standard then the fee retained by the defendants can be said to be within the limits of that measure. Moreover, Samuel Kunkel approved the fee and never at any time questioned the propriety or the amount of it. The decree appealed from should be reversed and the suit dismissed without costs.                    REVERSED AND DISMISSED.

JOHNS, J., Concurring Specially.—In legal effect the trial court affirmed the action of the County Court in allowing the defendants $3,500 as attorneys' fees

on settlement of the final account of the estate and found that it was—

"in full payment for all services the defendants had rendered both to the executors, and to Samuel Kunkel in connection with the settlement of said estate and the will contest; and that the amount so allowed constituted a reasonable remuneration for the said services."

The plaintiff did not appeal: Samuel Kunkel was not only made a party to the contest of the will, but he was a necessary party.

"All persons who may be injuriously affected by the judgment or decree sought, should be made defendants. Thus the beneficiaries in the will, heirs at law and next of kin, as well as the executor, if he has qualified as such, are usually deemed necessary parties": 40 Cyc. 1262, and authorities there cited.

As a matter of fact the executors were nominal parties and Samuel Kunkel was the only real party in interest.

While it was the duty of the executors to uphold and defend the will, and for that purpose they filed an answer, as such executors they would not and did not have any legal right to appear for Samuel Kunkel or to represent his interests otherwise than as executors, and could not make or enter into any valid, binding agreement of settlement or compromise without his express authorization and approval. If Samuel Kunkel had employed other attorneys than the defendants to represent his personal interests, the County Court would not have any right to determine the amount which such attorneys should receive for their services. So, in this case, the only authority which the County Court had was to ascertain and allow the amount of fees which the defendants should have for

legal services rendered to the executors as such, in the will contest; and it did not have any authority to fix or determine the amount of attorneys' fees which Samuel Kunkel personally should pay the defendants for services which they rendered him in the contest personally, as distinguished from the services which they rendered the executors. Nor is there any conflict in the character of such services. Any services which the defendants rendered in the compromise or settlement were personal to Samuel Kunkel. Hence the only question to be determined is their reasonable value.

It is conceded that Cake & Cake received $1,500 for their services in the matter of the contest only, and their client was a resident of Portland. The defendants' client was a resident of Germany, aged and burdened with disease, to whom a settlement was very important and for whom the defendants rendered much additional service. On this theory there is abundant testimony in the record that $3,500 is a reasonable fee for the personal services which the defendants rendered Samuel Kunkel, and for such reasons I concur in the opinion of Mr. Justice HARRIS.

BENNETT, J., Dissenting.—The object of this suit is to recover from the defendants, a firm of attorneys, certain sums, retained by them out of the estate of one Daniel Kunkel, for their fees as attorneys for the executors, and also as attorneys for the chief beneficiary of the estate, whose interests were also represented by the defendants herein.

Daniel Kunkel, in the matter of whose estate the services in question were performed, died in Portland, Oregon, on January 17, 1914, leaving an estate of the approximate value of $100,000, about $30,000 of which

was in real property, and the balance in money and secured notes. Mr. Kunkel had resided in Portland for many years. He left no lineal descendants, but was survived by his wife, to whom he had been married about twenty-five years. The latter years of their married life had apparently not been very happy, and when Daniel Kunkel died he left a will by which he bequeathed one third of the real property to his wife, and the balance of the real property and all of the personal property to Samuel Kunkel, a brother living in Germany. The defendants herein had been the attorneys for Daniel Kunkel for several years, and had drawn the will under which Samuel Kunkel claimed. After the death of Daniel Kunkel, the defendants notified his brother Samuel of Daniel's death, and that Samuel was a beneficiary under the will. Afterwards the executors named in the will were appointed by the court and proceeded to administer the estate. The defendants appeared as attorneys for the executors and also represented the interests of Samuel Kunkel. The widow, naturally, being dissatisfied with the will, threatened and finally actually commenced a contest, in which an answer was filed on behalf of the executors, and on behalf of Samuel Kunkel, by the defendants, but the case never went to trial. A compromise was arranged, to which all parties consented, and by which the wife received the real property absolutely, and also received out of the estate, $1,500 to pay her attorneys' fees and expenses in the contest proceedings, and the balance of the estate went to Samuel Kunkel under the will. After paying the expenses of administration, some small debts, the inheritance taxes, attorneys' fees, etc., there was turned over to Samuel Kunkel, and to his estate after his death, the sum of about $24,089 and an uncollected

promissory note for $27,500.  The defendants did the
necessary legal work for the administration of the es-
tate, represented the executors in the contest proceed-
ings, and also negotiated for and with Samuel Kunkel,
and between him and the widow, in arranging the
settlement, and they received from the executors, his
share of the money and transmitted the same, accord-
ing to his direction, to him in Germany.

The defendants presented their claim for fees for
their services to the executors, in the sum of $3,500,
which was allowed by the County Court.  They also
made a charge directly against Samuel Kunkel for
another $3,500 for their services to him.  In addition
to this, Kunkel, at one time—having received from
the defendants an installment on his inheritance, and
being generously minded—authorized them to take out
$1,000 from his share of the estate, as a Christmas
present for them, which they did.  They also em-
ployed one Hesse, a German attorney in Portland, to
assist them as attorneys, and especially in the transla-
tion of German letters and papers, for which they
agreed to pay him $1,000.  This, they reported to
Kunkel and he approved the same.

Kunkel was informed of their charge for $3,500 for
their services to him individually, and it is claimed
he assented thereto, but he was not informed that they
had also charged up and received from the executors
another $3,500 for their services to the estate, includ-
ing the contest; and it is claimed on behalf of respond-
ent that his assent to the payment of the last $3,500
was obtained and procured by the willful suppression
of the fact that they had already been paid for these
services by the estate.

Before the estate was finally settled Samuel Kunkel
also died, and the plaintiff herein brings this proceed-

ing as his administrator, claiming that the fee paid to the defendants, as attorneys for the executors, was exorbitant and should not have exceeded $1,500; that said amount should have covered their entire services, both for the estate and for Samuel Kunkel individually, and also for the services of Hesse; and that the gift from the client to the attorneys of the $1,000, should not be permitted to stand.

The court below allowed the defendants the $3,500 as attorneys for the executors, the $1,000 for the services of Hesse, and the $1,000 as a gift, but refused to allow the $3,500 charged for direct services to Samuel Kunkel. From this decree the defendants appeal.

From the opinion of the majority of the court I am compelled to dissent. Measured by the value of the services performed by the appellants for Mr. Kunkel, and for which they were not otherwise recompensed, their charge of $3,500 seems to me exorbitant and unconscionable; and, as I view it, Mr. Kunkel's approval of that fee was obtained by such an important and unfair suppression of fact, as to prevent the defendants from gaining any advantage by such alleged approval, under the rule governing the relation of attorney and client, as stated in the majority opinion.

With the rule governing the duty of an attorney toward his client, as stated in that opinion, I am entirely satisfied. I quote again from the language of the opinion, taking the liberty of italicizing the portions which seem to me to have more particularly concrete application to this case.

"The relation between an attorney and client has always been treated as one of special trust and confidence; and for that reason the law requires that the conduct of an attorney, when dealing with his client, shall be characterized by *fairness,* honesty and good

faith. Indeed, so strict is the injunction not to take advantage of the client, that when a client challenges the fairness of a contract made with his attorney the latter *has the burden of showing* not only that he used no undue influence, *but also that he gave to his client all the information* and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been if the latter had dealt with a stranger."

These are brave, strong words, and with every syllable of them I entirely concur. They fix the duty of an attorney toward his client at a high standard—but not too high, when we consider the peculiarly confidential relation which an attorney enjoys; and the fact, that those with whom he deals, are oftentimes helpless from infancy or old age, and are generally ignorant of the law, and of their legal rights; and practically at the mercy of the lawyer who represents them. Such a declaration of the principles which govern attorneys, will be an inspiration to the lawyer who cares deeply for his profession and for its honor.

When it becomes generally known, that this is the standard which governs the conduct of attorneys—and that the courts unflinchingly carry the principles so declared into execution—there will be an end of that unjust belief, unfortunately now so general among laymen, that lawyers are mercenary and unscrupulous grafters; and that the courts, being composed of lawyers promoted, look with complacent tolerance, and winking eye, upon the unjust greed and rapacity of their erstwhile associates.

If I would add anything to the words of the majority opinion in this regard, it would be in the language of Mr. Thornton in his excellent new work on Attorneys:

"Attorneys, in entering into contracts of employment with clients, are required to exercise the *highest order of good faith,* not only in advising the client, but also in disclosing *all* information in their possession, as to facts which *would* or *might influence him,* either in entering into or refusing to execute the contract. The failure to do so renders the contract *presumptively void.* * * The burden is *on the attorney* to show that the client was advised and informed": 2 Thornton on Attorneys, § 429, p. 743.

Keeping in view, then, the rule in such cases, let us attempt to apply it in this case, and see whether or not the conduct of the defendants in the case measures up to these high standards. For if it does not, and we, directly or tacitly, approve of their action, and help them to reap the profits of the transaction, then, as it seems to me, our fine words had far better never have been said. They will be "like dead sea apples—pleasant to the sight but ashes to the touch."

I assume—as there is no appeal by the plaintiff from that part of the decree which favored the defendant—that the only question before us which we can readjudicate, is the claim for the last $3,500 for the services alleged to have been rendered by the appellants to Mr. Kunkel individually. However, it does not follow, that we should not consider the other sums received by the appellants, in so far as they affect the fairness and justice of the charge of the last $3,500, which *is* before the court—for instance, if the sum of $3,500 received by the appellants from the executors was for the same services, or part of the same services, for which they are now trying to charge Kunkel individually; then having once received compensation therefor, it would be utterly unjust to permit them, to again collect from Mr. Kunkel, for the same service. No court of equity would permit so

unjust a result, and if it would, it would cease then and there, to be a "court of equity."

The same suggestions apply to the $1,000 collected by the appellants and turned over to Hesse, for assisting in doing whatever was done, in the matter of Mr. Kunkel's individual interest. If he performed part of the services and was paid by Mr. Kunkel, that *reduces the work left to be done by the defendants,* in the same matter; and it would be obviously unjust for them, having induced Kunkel to pay the $1,000 to Hesse, to then charge him again in their own behalf for that part of the work which he had already paid Hesse for doing. It becomes necessary, then, in analyzing the case, and finding out whether this last charge of $3,500 to Mr. Kunkel individually, was just or unjust, to separate the work for which they have already been paid by the executors, and the part of the work of taking care of Mr. Kunkel's interests performed by Hesse, from the remainder of the services performed; so that we can see what services are left, and what, if any, fair relation, they bear to the large sum charged.

In considering this question we must remember constantly that *all* the amounts received by the appellants, came, directly or indirectly, *out of Mr. Kunkel's pocket.* The $3,500 paid to the defendants by the executors was really paid by Mr. Kunkel, for he was the residuary legatee, and everything left from the estate belonged to him. At the time when these fees were allowed by the executors, it had been agreed exactly what Daniel Kunkel's wife was to receive, and the defendants, and everyone else, who had any relation to the case, knew full well, that whatever came out of the estate in the way of executors or attorneys' fees, came out of funds otherwise belonging to Samuel

Kunkel. Indeed there was no longer any real neces-
sity or reason for separating the fees, unless it would
be, by this manipulation, "to make two fees grow,
where one had grown before."

Of course, in determining the services which the
defendants had a right to charge up as an individual
charge against Samuel Kunkel, I think it will at once
be conceded, that they had no right to charge for any
services in overseeing the final settlement and pro-
tecting his interests, in the matter of the executors'
fees and their own attorneys' fees, for the simple rea-
son that they *did* nothing, and could do nothing, in
that regard; for in that, the defendants had put them-
selves in an impossible and inconsistent position.
They were attempting to represent the executors, who
were interested in getting the largest possible fees,
and they were also interested in getting the maximum
fees for themselves. And at the same time, they were
supposed to be representing the interests of Mr. Kun-
kel; whose interests were, to have the executors and
attorneys' fees reduced to the smallest possible mar-
gin. The result was, that no one really represented
Mr. Kunkel before the County Court at all. There
were no objections whatever filed to the executors'
fees; neither was there any objection made to the fees
demanded by the attorneys.

In practice, the arrangement worked out beautifully.
The executors and attorneys, apparently, resolved
themselves into sort of a mutual approval society.
The executors came in and demanded their fees.
They demanded the statutory fee, not only on the per-
sonal property, which passed through their hands, but
also upon the $30,000 worth of real property, for which
they did not account at all. And in addition to this,
they demanded their fees on the whole estate, as erro-

neously appraised at $108,000, although $10,000 of that was an obvious double appraisement, and the estate really totaled only $98,000. Nevertheless, these fees were, apparently, approved by the defendants. Indeed, we may safely assume that the report of the executors, asking for these executors' fees, was written by the defendants as their attorneys.

Again the executors, with equal complacence, included in their report a request—in addition to their own fees—for $3,500 for the attorneys, although it appears from the evidence that the fees fixed by the rules of the Bar Association for acting as attorneys in such an administration, would only have been about $1,000 or $1,100; and to these attorneys' fees again there was, of course, no objection, and Mr. Kunkel's interests again were not represented. The County Court, finding that there was no objection whatever on behalf of Mr. Kunkel's attorneys, and that the executors' claim for fees was approved by the attorneys, and that the attorneys' claim for fees was approved by the executors, allowed each of them the full amount claimed.

It is obvious that the appellants' supposed representation of the individual interest of Mr. Kunkel was, in this particular, really of no value whatever. They did nothing for him, and in the very nature of things, could do nothing for him. They were trying to perform two inconsistent duties—to ride two horses going in different directions. It goes without saying that attorneys cannot properly act for both parties under such circumstances, even with their consent.

"Even by the consent of the parties, an attorney is not permitted to act on both sides of a cause": Weeks on Attorneys, § 120.

"It is a well-settled general rule that an attorney cannot represent conflicting interests, or undertake the discharge of inconsistent duties": 1 Thornton on Attorneys at Law, § 174.

"So an attorney for the executors of an estate is disqualified to represent the heirs for the purpose of supervising the proceedings of the executors with reference to distribution": Id., § 175.

Now let us see how much of the services performed by the defendants in the whole transaction were paid for by the $3,500 received from Mr. Kunkel's funds, through the executors, and, therefore, not fairly chargeable to him again, as an individual. That this fee paid through the executors was intended to and did cover, practically the entire services in the matter of the contest, seems entirely plain. Judge Cleeton, who presided in the County Court and allowed the fee, and therefore must be presumed to know, being called by the defendants, testified:

"The matter came up in regular order and in due course of the administration after the settlement had been reached by the attorneys representing the respective contesting parties, and after it had been approved by the court, it came on then for fixing the fees for the attorneys. It came on *without a contest and without any objections being filed.* Mr. Bernstein *presented the claim for attorneys' fees,* and stated the attorneys claimed for their services *$3,500 representing the executors of the estate.*

"Ordinarily an estate of that size that proceeded without contest and in the usual way, the attorneys' fees should be something like about $2,500 to $3,000, and I *estimated that to represent and provide a defense against a contest of an estate of that value,* it would be worth from $500 to $1,000, and I fixed the fee accordingly at $3,500."

On cross-examination he testified:

"Q. Mr. Bernstein, himself, asked that the fees

should be as much as $3,500, did he not, when he presented it to you?

"A. Yes—he made application for his fee as is customary by attorneys.

"Q. That was fixed before the account was filed, was it not?

"A. I think he put his claim in—he made an oral statement of the matter to me that he had asked for an attorneys' fee of $3,500."

Again in his cross-examination:

"Q. In connection with his application to you to fix the fee, Mr. Bernstein always called attention to the fact that the attorneys, himself and Mr. Cohen, had handled the contest matter and made the compromise, did they not?

"A. Yes, I understood that.   I understood that.

"Q. You took that into consideration in fixing the fee?

"A. Yes, sir.

"Q. Do you know what the Bar Association rule is (as to fixing attorneys' fees for executors)?

"A. No, I *think they allow the attorney about one half of what the administrator is supposed to get.* * *

"Q. Also in this case, there were no probate sales, were there?

"A. I don't remember that there were—I think not.

"Q. And there was, I believe, only one account—the final account?

"A. Yes, that would leave only the final account in that case.

"Q. The final account itself, was a very brief document, was it not?

"A. I think, from the nature of the estate, the final account was not a complex or comprehensive document.

"Q. *You were taking into consideration the services rendered,* I believe you have already said, in *connection with the handling of the contest and the compromise of it in fixing those fees?* ·

"A. Yes, sir."

Judge Cake, who was also called as a witness for the defendants, in his deposition testified:

"Well, I didn't take any part in the matter at all. *Mr. Bernstein suggested to the court the work of the attorneys, referring to this case* (the contest) and I didn't remember what the fees were fixed at. The court considered the matter talked over with Mr. Bernstein and asked questions concerning the situation, and it was fixed *in the immediate light of the litigation which had just been concluded.* * *

"Q. At the time the court made the order allowing the attorneys' fee of $3,500, the court's attention was particularly brought to the matter of this litigation, as I understand it?

"A. To the what, you say?

"Q. Was particularly drawn by Mr. Bernstein to the matter of this will contest and the services that had been rendered in that connection.

"A. *That was brought up. I stood there at the end of the bench and Mr. Bernstein stood in front of the court, and he told him the circumstances under which the litigation had been brought,* and the other conditions with which the administration of the estate was affected.

"Q. The allowance of the attorneys' fees was based upon Mr. Bernstein's statement that was thus submitted, as I understand?

"A. Why, of course; now I could not tell you about that, but the history of the case and the history of the estate would, of course, be well known to Judge Cleeton.

"Q. *Yes, but attention was drawn to the fact that the attorneys for the executors had attended to the will contest and also to the settlement that had been made.*

"A. Yes, yes.

"Q. These items were brought in for the court's consideration?

"A. Yes, oh, yes."

And again the same witness testified:

"A. Yes, about the way I figure that, Mr. Veazie,

is this: Even if this suit had not been in there, if there had not been any suit there and had been the administration of the estate, a couple of thousand dollars for the ordinary estate of a hundred thousand dollars should be charged.

"Q. You figure that if there had not been the litigation over the will, $2,000 would have been a fair fee?

"A. *If there had not been any litigation at all, yes, $2,000 would have been a very fair fee for the executors.*

"Q. And there ought to have been an allowance of $1,500 more for the conduct of the will contest?

"A. Yes, yes; very, very reasonably so; very reasonably so."

Indeed, the large fee of $3,500 for the attorneys in this simple estate, could not possibly have been sustained upon any other theory. Every witness called for the defendants, who testified that the $3,500 was reasonable, based their testimony upon the fact that the contest, and all the work of the contest, was included; and not one of them ventured to say that $3,500 would have been a fair fee for the administration alone; while the witnesses for the plaintiff place the value of the services, including both administration and contest, at a much less sum. It appears that the rules fixed by the Bar Association placed the attorneys' fees at one half of the amount allowed the executors.

Judge Cleeton, himself, testified:

"Q. Do you know what the Bar Association rule is (as to fixing attorneys' fees for executors)?

"A. No, I think they allowed the attorney about one half of what the administrator is supposed to get."

As the Bar Association is composed entirely of lawyers, I think we may safely assume that the fee fixed

by them is a reasonable one, and not too low. It is true that some of the attorneys who were witnesses, were disposed to quarrel with the schedule fixed by the Bar Association—basing their judgment upon the ground that such a division was unfair, because the attorney generally did all the work. This may be true as between the attorney and the executor, but that is no reason why the *estate* should suffer a double charge. If the executor puts the work that properly belongs to him on to the attorney, and the attorney does it, the executor should pay for such services *out of his fees*, and not out of the estate. The law allows the executor so much for the performance of his duties; and it would be exceedingly unjust, to permit him to collect the whole amount of his fees for performing such duties, and then turn the work over to an attorney, and let the attorney charge up the estate *again* therefor. The attorney should only be allowed for merely legal services.

In this case the estate was a very simple one. It was nearly all in money and real estate, except one large note. The real estate was not sold. The note was not sued upon for recovery. Outside of the contest with the widow, there were no complications whatever. There was no more work about the administration than there would be about the ordinary $500 estate. There was nothing that required any particular or special skill or unusual ability. There was no responsibility for the investigation of title or the sale of property. There was only the petitions to draw, and one or two accounts and the final account to prepare, and perhaps a few other incidental services. The entire work of settling the estate, if put together, would not have taken two weeks of the time of any attorney. Under such conditions the fees fixed by the

Bar Association would seem to be entirely ample, and, as I have said, it seems impossible to have reasonably stretched those small services ' to cover the $3,500 charge, without including the entire services in the contest matter; and, as we have seen from the testimony, as a matter of fact, they were included.

It has been urged that this contest was the individual matter of Mr. Kunkel, and that, therefore, the services of the defendants in that regard, were not properly chargeable to the estate. This seems an exceedingly narrow and technical view, and I do not think it can be sustained. The very right of the executors to be executors at all, was involved in the contest, and as attorneys for the executors, and on behalf of the estate, the attorneys were bound to do *everything that could be done* and make every exertion in their power, to sustain the will. But in any event, *it does not lie in the mouths of the defendants,* to say now, that their services in that contest, were not for the estate and properly paid for by the estate. According to the testimony of both Judge Cleeton and Judge Cake, already quoted, they went before the County Court and asked *to be allowed this fee for their services as attorneys in the contest,* and it was allowed to them upon their own solicitations and representations.

Indeed, it appears that the final report of the executors, which we may assume was prepared by the defendants, contains the following representations in regard to the services which the fee was to cover:

"In addition to which the executors have employed the firm of Bernstein & Cohen as their attorneys, who have acted as such since the probate of the will, and also have given special and additional services in the contest filed by the widow of deceased, *and the settlement of the same, for which services* they request that the attorneys' fees be fixed at $3,500."

They ought not now be permitted to come back and say the fee was not properly allowed in the County Court, and having got it down in their pockets, ask to collect it *again,* directly from Mr. Kunkel, who has already paid it once indirectly.

The only remaining question then upon this branch of the case is, whether the comparatively small services that were left, after taking out the contest and the estate already paid for, were fairly worth so large a sum as $3,500. No doubt there were some services performed by the defendants for Mr. Kunkel individually and which were not paid for through the executors. Such services were the correspondence, the transmitting of the money and the formal appearance for him in the contest. To say that such services were worth so large a sum as $3,500 seems to me so startlingly unjust as to be almost absurd.

Then it must be remembered that even these services are to be divided, because Hesse was employed by the defendants themselves, to perform part, if not all, of the same; and for this they paid him $1,000, not out of their own but out of Mr. Kunkel's funds. It must be presumed that he performed, at least a part of the work involved in the correspondence, and whatever else there was to do. Mr. Bernstein himself, in one of his letters to Kunkel, says: ''That Hesse was employed to assist in the correspondence and as an attorney in the case,'' so that in ascertaining what was the value of the services performed for Mr. Kunkel, we must take out that portion presumably performed by Mr. Hesse. To allow the defendants to collect for the same services once for Hesse, and again for themselves, would be manifestly unjust. To my mind, therefore, a fee of $3,500 to be collected by the defendants from Kunkel, in addition to the $3,500

already received through the executors, and the $1,000 collected by them for Hesse, is clearly unreasonable.

In arriving at this conclusion I have said nothing about the $1,000 gift. That stands a little different from the other matters already considered. Nevertheless, it had some bearing upon the general relations of the parties. No doubt it was intended as in some sense a partial remuneration for the services performed by the defendants. Mr. Kunkel does not seem to have known the defendants at all, and there was no reason why he should have given them a thousand dollar Christmas present, except that he had so intended it. The defendants in their letters to him had constantly asserted and protested their unselfish and undying devotion to his interest.

In the letter of March 3, 1914, Mr. Bernstein says:

"You can rest assured we shall look after your interest to the best of our ability, and that it shall always be our aim to represent your welfare and interest most energetically."

In the letter of March 30th, ensuing, he says again:

"*Rest assured* that we shall look after your interests to the best of our ability, and that we understand your position perfectly."

In the letter of February 23d:

"You can *rest assured* that we shall keep you forthwith *informed as to all developments in this estate, which concern your personal interests.*"

In the letter of July 2d:

"On account of the intimate friendship always existing between your brother and us for a lifetime, and on account of the exceptional confidence which we enjoyed, it will be to a certain extent our duty to your deceased brother to see to it that his estate is administered, etc."

If Mr. Kunkel had been a reader of our own Shakespeare, he might have thought with old Falstaff, that the defendants "did protest too much," but as it was, he seems to have been very much impressed by these protestations, and he evidently thought that such unselfish and professed devotion to his interest, deserved some special reward. Perhaps he had read of the old time English law, when an attorney could charge no fee, and intended this $1,000 as a sort of honorarium. Perhaps he thought if he was generous with the defendants, they would at least be fair with him. Perhaps in his innocence he thought he could "bribe" them to do what was fair and right.

At any rate, it is perfectly plain that while he called the $1,000 a gift, he really intended that it should be some sort of a reward for the services which he hoped to receive from the defendants. As I have already said, it seems to me that from any viewpoint, the charge of $3,500 for the small services which the defendants performed individually for Kunkel, and for which they had not been paid, after already receiving $3,500 from the executors, is exorbitant and unfair.

It is urged in the brief by the learned attorneys for appellants, that if this money had been collected and transmitted through the German consulate, the charges for consulate fees and attorney's fees, would have been as large as those made by the defendants for the same services. It seems a poor defense to a bad act or an exorbitant fee that someone else would have committed as great a wrong or charged as unjust a fee. But since it throws a sidelight on this transaction, let us inquire. In the brief of appellants a calculation is made from which it is figured that the charges of 2 per cent by the consul and 5 per cent for attorney's fee would have amounted to something

over $3,900, and the result of this calculation seems to have been accepted bodily in the majority opinion.

But this conclusion, as it seems to me, can only be reached by disregarding the evidence, and figuring the percentage on the amount of the promissory note, which was transmitted without collection, as well as the money collected and transmitted. As a matter of fact the evidence shows this would not have been done.

Mr. F. H. Ritters, secretary to the German consulate, testified in regard to the official tariffs for the remittance of money from this country to Germany, as follows:

"Q. Will you kindly state what the official tariff of fees for the remittance of money in the states is at the present and what the preceding tariff was, if there has been a change and to what years it applies?

"A. Since January 1, 1911, we are charging 2 per cent—yes, sir, 2 per cent of the *money* forwarded to the heirs. That means 2 per cent of the *moneys collected,* and after the attorneys' fees are deducted.

"Q. Before that, what was the schedule?

"A. One and two thirds per cent of the first $500 and one third per cent of each additional $100.

"Q. How far back did that schedule apply?

"A. From 1872."

Mr. Veazie, who was attorney for the German consulate at that time, testified:

"Yes, sir; there are fees charged for the transmittal of money, for the actual money transmitted.

"Q. For the money actually transmitted?

"A. Yes, sir.

"Q. Do you know what that fee is approximately?

"A. *Two per cent on the money actually transmitted.*

"Q. And the consul, did he get anything out of these estates, or any of them? The consul here?

"A. Not a cent, no, sir. The consul here was an honorary consul, serving absolutely without pay or fees. * *

"Q. *Would these charges of fees in a case of this kind, for instance, where there was $25 or $26,000 in cash, and $27,000, or such a matter, in securities, would that fee be charged on the securities as well as on the cash?*

"A. *No. No fee is charged excepting on the cash actually transmitted.*"

And he testified further in regard to the attorneys' fees.

"A. The standard fee charged in cases where we have handled the business of an estate, including attention to it during administration and drawing the necessary proofs and documents in the case, and doing all that is necessary, is 10 per cent on the first $1,000 and 5 per cent on the balance. * * But in cases where there is a will and no proofs are required and no special services are needed, we usually have made a much lower charge than that, varying with the amount of services required."

This is the only testimony in the case upon this point; so it is perfectly clear that the charges of two per cent for consulate fees, and five per cent for attorney's fees, would only have been on the cash transmitted, which amounts in this case in round numbers to $28,600, including what was retained by the attorneys. The note was never collected, and there was nothing to be done in regard to it, and nothing could be done, except to receive it from the executors and put it in a letter directed to Samuel Kunkel, and deposit it either in the postoffice or in the express office.

To suppose that either the German consul or the attorneys for him, or any other reputable attorney, would charge 2 per cent or 5 per cent on the amount of a note for $27,500 for the nominal service of taking it to the postoffice, is as contrary to every presumption of honesty and fair dealing, as it is to the posi-

tive testimony in the case. So, as a matter of fact, the maximum charge, if this matter had gone through the hands of the German consul instead of defendants, both for consulate fees and attorney's fees, would have been figured like this:

Consulate fees of 2% on $27,000.............$  552.00
Attorney's fees of 10% on first $1,000......   100.00
Attorney's fees of 5% on remaining $27,600 1,380.00

Total..............$2,032.00

Even this charge would have seemed an exorbitant one for the services performed. And, indeed as we have seen, Mr. Veazie testified that in cases where there is a will, there was usually a much lower charge. But when we consider that these services would have covered everything the defendants did for Mr. Kunkel, that they were not paid for through the executors, and that it would also have covered the services for which the defendants paid Hesse $1,000, it is apparent that the defendants' charge for doing the same work, for themselves and Hesse, was more than double what Mr. Kunkel would have paid, if the matter had been attended to through the regular official channels. So the comparison stands in round numbers, $4,500 against $2,000.

Also it must be remembered, the attorneys thus acting for Mr. Kunkel, would not have been tied up with the executors and would have (presuming that they were honest), *in addition to all the services performed by the defendants,* gone before the County Court and objected to the fees charged by the executors on the false appraisement and on the real property that was never sold, and it may fairly be presumed would have succeeded in reducing the charges of the executors by at least $200.

Again, they probably would have succeeded in reducing the attorney's fees to some approximation of the standard fixed by the Bar Association. So that Mr. Kunkel, besides the difference of $2,500, in the amount of fees, which he would have had to pay directly, would also, in all reasonable probability, have saved from $200 to $1,200, by reason of having independent attorneys, who would have represented him before the County Court in the matter of the final account.

The only remaining question is, whether or not the defendants, having driven a hard bargain with Kunkel, and induced him to tacitly, at least, assent to this charge, can now successfully "demand their pound of flesh," and insist upon their hard bargain because of that assent. Here we are met by the principle enunciated in the beginning of the majority opinion, and in the quotation from Thornton on Attorneys, already alluded to.

The defendants were attorneys. They were dealing with a client, and a client, who, by reason of age and distance, was more than ordinarily helpless and at their mercy—more than ordinarily dependent upon them for good faith, fair dealing, information and advice. Then, if we are to follow the accepted and announced rule governing the relation of attorney and client, the defendants, in obtaining Kunkel's assent and approval of their fee and his agreement thereto, should have exercised the *utmost* fairness and good faith and should, in the language of Judge Thornton, have disclosed "*all information* in their possession as to facts which *would or might influence him.*" And if they did not do so, his supposed assent falls to the ground and comes to naught.

The question then is: Did they deal with him, with the *highest* degree *of fairness?* Did they disclose to him fully, *all* information which was in their possession, which *would* or *might* influence him? Did they communicate to him all the information which they would and should have communicated to him if they had been strangers to a transaction between him and third parties, and about which he was consulting them. We think the contrary is clear to all. The very day before they wrote to him, asking for his assent to the charge against him individually of $3,500, they had received from funds belonging to him, through the executors another $3,500 for their supposed services in his behalf, through the estate. This matter was then fresh in their minds. They could not have forgotten it. Yet they do not say in their letter to him one word, or inform him in any way, in regard to the previous charge. Neither did they tell him that they had claimed from the executors, and been paid by them, for their services in the contest matter. Why this silence, about a matter so nearly and vitally touching Mr. Kunkel's interests, and so inseparably related to the fairness of the additional fee they were asking him to agree to? Was it not a matter about which he had a right to know? Was he to be kept in complete ignorance of what had become of so large a sum of his money?

We may find an excuse, perhaps, if we will, for their failure to send him a copy of the different accounts, showing just how the estate stood, and dismiss it as merely 'imprudent.' But here was a single large item amounting in one disbursement to thousands of dollars. And it was *paid to and received by them.* Can anyone excuse their failure to inform their principal in relation to such a charge, under such circum-

stances? Even if they had not been asking for another and further fee, it would surely have been their duty, as attorneys and agents of Mr. Kunkel, to give him information of so large a charge against him. And was it not all the more their duty, when they were asking him to agree to a *still further fee?*

They had solemnly promised in their letter of February 23d,

*"You can rest assured that we shall keep you forthwith informed of all developments in this estate which concern your interests."*

Independent of the promise, it was their bounden duty to give the information, or else all our fair words about the duties of an attorney go for naught. Was it "fair" to Kunkel to get him to agree to another fee of $3,500, without first telling him that they had already received, the day before, a big fee of a like amount, paid through the executors and also out of *his funds,* and that this fee covered their services in the contest with Mrs. Kunkel, and in the settlement of that contest? Was there a compliance with the rule announced by this court that "the conduct of an attorney when dealing with his client shall be characterized by *fairness,"* and that the burden "is on the attorney to show such fairness?" Was this giving him *"all the information* which it would have been their duty to give, if they themselves had not been interested"?

Was this a compliance with the rule stated by Mr. Thornton already quoted, that attorneys are required in such matters to "exercise the *highest order* of good faith in disclosing *all information which would or might influence"* the client? Can anyone logically say, that it would not and might not have influenced

old Mr. Kunkel in concluding whether he would assent to this large fee, if he had been informed that the defendants had already received from his funds another fee equally large? Do not the conditions and circumstances drive one irresistibly to the conclusion, that the very reason why the appellants did not inform their client of the first $3,500 fee, was because they *feared* that the old gentleman *would* take it into consideration, and *would not be so willing to pay them the second $3,500*, and the $1,000 for Hesse, if he was informed that they had received the first fee?

It must be remembered that the defendants were just as careful, apparently, to not inform the County Court, when they were asking for a fee from it, that they expected another fee from Kunkel, for the same services, or that part of the services were to be performed by Hesse at Kunkel's expense, as they were not to inform Kunkel of the fee received from the County Court. It must be conceded by everyone that rightly or wrongly, justly or unjustly, legitimately or illegitimately, the appellants had their hands down deep in both Mr. Kunkel's pockets. With one hand they were taking $3,500 from one pocket through the executors, and with the other they were extracting $3,500, yes $4,500, through the individual charge. And they were carefully obeying the biblical injunction, "Do not let thy right hand know what thy left hand doeth."

It is urged in the brief on behalf of defendants, that the court should assume that these facts were actually known to Kunkel at the time he assented to the $3,500 individual fee, through other sources; but I cannot assent to this view. The burden was upon the defendants to show definitely that Kunkel did know these facts. The evidence tends strongly to show affirma-

92 Or.—28

tively that he did not have such knowledge. In the letter of December 14, 1914, in which he assents to the $3,500, he says:

"With your balance I am completely agreed and satisfied. *Have the executors been paid,* or do both gentlemen live in such good circumstances that they do not request any administrators' fees?"

So it is apparent that Mr. Kunkel did not know at that time that fees had been allowed, even to the executors, and it is not to be supposed that he knew of the $3,500 allowed to the executors *for their attorneys,* because, had he known, he would certainly have mentioned it in that letter. Under these circumstances it was natural that he should suppose the $3,500, which he was paying, covered the entire services of the defendants, in the absence of any statement from them that they were getting any other pay. I think his assent under these conditions to the payment of the additional $3,500 should be disregarded.

While it is practically admitted that the defendants did not inform Kunkel that a fee of $3,500 had been allowed and paid by the executors, or that this fee covered their services in the contest proceeding; yet it is strongly urged, that because the defendants had, in letters to Kunkel some months before the final settlement, informed him that there would be a fee from the executors; that that, was a sufficient fulfillment of their duty, to give him *full* and *complete* information of *everything* within their knowledge; and that it was, therefore, unnecessary for them to inform him that the fee had actually been allowed, or of its large amount, or that it covered the services in the contest and compromise.

But even if we assume that old Mr. Kunkel carried all the details of the voluminous correspondence of

months before in his mind, and therefore remembered, when he received the letter of November 19th and answered the same, that a fee as attorneys for the executors had been mentioned, yet it did not give him the slightest knowledge of the important things—the *large size* of the fee already received, and the fact that *it covered defendants' services in the contest and settlement,* and therefore made any second charge to him for these matters, a double charge. Allowing for every item of information the defendants had given him, and assuming that he remembered it with the utmost clearness, it would only tell him that the defendants expected to receive *some* fee from the executors—whether that fee would be $100 or $500, and whether it would be confined to the conventional details of the estate—or would include their services in the contest and settlement, he was in no way informed.

If he had been acquainted with the practice of lawyers in this country and the rules of our Bar Association, he would probably have figured that such a fee in the estate matter would be about $1,000. But he had no knowledge of such things, and if he thought about it at all, he would probably expect it to be a much smaller sum. Certainly he would never imagine it would be so vast a sum as $3,500 in addition to the $3,500 they were charging him directly for services in the same matter. When they had written him the previous letters they did not know and could not state the amount of their fees from the executors, although they might *have given an approximation.* But when they wrote the letter of November 19th, *they knew exactly what they had received and that it covered the contest and settlement.*

*Why, then, did they not communicate that information to their client,* when they were asking him for this

other large fee? Was not theirs, at best, a poor and
shabby pretense of performance, of the duty, which
we have just declared rested upon them as attorneys
to *fully* inform their client of *every* fact in their pos-
session which *might* influence his judgment?

If Kunkel and the defendants had been strangers,
dealing at arm's-length, such fragments of informa-
tion might possibly be accepted as giving Kunkel no-
tice that *some* fee was to be charged. But here they
were not dealing at arm's-length. They were dealing
with an *old man* thousands of miles away and he was
*their client*. He was utterly dependent upon their
good faith. If that were possible, they had added to
their duty as attorneys by frequently protesting their
entire devotion to his interests. By their promises
and assurances they had won his complete confidence.
Under such circumstances, they should not now be per-
mitted to stand upon any technical doctrine of "no-
tice" or upon any half disclosures, which left their
client in the dark as to the most important elements.

It is said the defendants told Kunkel *three times* in
the course of their long correspondence, that they
would charge him "some fee" through the executors.
But they did not tell him *once* that such fee had been
actually received. They did not tell him *once* that it
amounted or would amount to thousands of dollars.
They did not tell him *once* that it covered the contest
and settlement.

It is also urged that Mr. Kunkel knew the amount
of the estate, and knew the amount he was to receive,
and that, therefore, he could figure out in some way,
the things which he had a right to know; and it is
suggested that he was a "schoolmaster," and there-
fore must be presumed capable to do this figuring and
protect himself. But it must be remembered that

while he had been a teacher, he was at the time of these events, a superannuated one. He was an old man and apparently childish, as one at such an age would naturally be. He had reached the age of 78 years—had passed the three score and ten allotted to man, and was approaching close to the four score which some men reach "by reason of their great strength." He was suffering with the troubles and afflictions of such great age. He had lost his wife and was sick himself, during the very happening of these events.

It is true that "schoolmasters" are presumptively intelligent, but they are not all like Goldsmith's village teacher, who amazed the gazing rustics "That one small head, could carry all he knew." Generally, they lead simple lives, and come in contact mostly with children and inexperienced youth; generally they know little of business affairs, and especially of lawsuits, and the settlement of estates. Kunkel, in particular, knew nothing of American lawyers, or their charges, or of the methods here of probating estates. In these matters he would have been no even matcher of wits with the defendants, even at his best. At his advanced age he was as helpless in their hands, in such matters, as they would have been, no doubt, in a discussion with him over Greek verbs or Latin translations.

Besides, he would have had to be possessed of the uncanny deductive powers of a Sherlock Holmes, to have reached any conclusion from the information he had as to whether or not the defendants had actually received a fee from the executors, or how much it was if they had received one, or that it covered the services in the contest and settlement. It is true he knew (from others) the appraised assets of the estate, and

that he might have been able, from the information which had been given him, to figure the total amount that had been disbursed. But that gave him no light upon the *justness or injustice of the fee the defendants were then demanding.* He was not informed, and he could not tell, how much of this total disbursement had gone for taxes, or inheritance taxes, or for other legitimate purposes; or whether any part of it had gone to defendants for a fee.

The defendants, being his attorneys, and having won his confidence by their repeated assurances, he naturally assumed that *all* of the disbursements were legitimate. He had absolutely no way of calculating that $3,500 of the total disbursements had already gone into the defendants' pockets, when they were asking him for another fee of like amount, and $1,000 more for Hesse. The language of the defendants in making the charge for the additional fee was indefinite and equivocal.

"For the professional services of Messrs. Bernstein & Cohen, which have been rendered for you to date, I charge the sum of $3,500."

There was nothing in this language to indicate *what* services they were charging for, or whether or not they were charging him for the contest and settlement—nothing to distinguish between the services performed for him directly, and those performed for him through the estate. It must be remembered that everything they did in any capacity (except fixing the fees for themselves and the executors) was "rendered for him," since he was the only one to benefit, and it was all to be paid for out of his funds.

It did not make the slightest difference to Kunkel, or from his standpoint, whether the fees came in in the shape of one fee or two, provided that the total

was reasonable and just. He knew that whatever the defendants received would come out of his pocket anyway, whether they were paid directly or through the executors. When he received their bill in this indefinite shape—*without any reference to any other charge* —he would, naturally, from his standpoint, suppose that their bill had been consolidated, and covered all their services. The large amount of their charge, which must have seemed to him ample to cover their entire services, would naturally strengthen that supposition. That he did so conclude, is plain from his answering letter, in which he says *nothing about any other fee to them,* but wonders and inquires why the executors *are not charging any fee.*

"Do the two gentlemen, Mr. Scheller and Mr. Wagner, live in such good circumstances that they do not claim any executors' fees?"

The old man had a perfect right to assume that if the defendants had already received a fee—certainly if they had received a large fee—out of funds belonging to him, that they would inform him of the fact; and to infer that they *had not,* when he received no such information. How easy—*and how natural*—it would have been, if Mr. Bernstein wanted to be entirely fair, for him to have written instead of the indefinite and equivocal letter he did write—something like this:

"For the professional services of Messrs. Bernstein & Cohen to you *individually* I charge the sum of $3,500. *This does not include our services to the estate nor in the contest and settlement with Mrs. Kunkel, for which we yesterday received through the executors, an additional $3,500.*"

If they had done this, or anything similar, they would have been fair—*and no more than fair*—with their client. Kunkel could then have intelligently as-

sented to or rejected their proposition. They would then have complied with the rule laid down by this court in the majority opinion, and observed that *"high degree of fairness"* which is said to rest upon attorneys, and under which, before they deal with a client, they must *fully* disclose *every* fact which *might* enter into his decision.

The services performed by the defendant for Mr. Kunkel individually, and for which the defendants have not been paid, as I view it, are the transmitting of the money, the correspondence with Kunkel and the formal appearance for him in the contest proceeding. These services were not exceedingly great, and I think $1,000, in addition to the $1,000 received by Hesse, would be full and ample compensation therefor. I think the judgment of the court below should be modified by allowing defendants for the value of such services and as thus modified, affirmed. This is the only conclusion which seems to me possible from a close analysis of the case.

It is suggested that this conclusion would be in the nature of a compromise and therefore should not be entertained, but I do not see that it involves a compromise in any obnoxious sense. The compromise abhorred by the law, as I understand it, is one that attempts to split the difference between right and wrong, and run the line of cleavage halfway between justice and injustice. The line of real justice does not always measure the extreme claim of either party, but lies quite as often, somewhere between the two. And when this is so, and that just line can be ascertained, there is no impropriety in there fixing our decision, even although it may be in some broad sense in the nature of a compromise.

Here the defendants are justly entitled to the reasonable value of the services actually performed for Mr. Kunkel, and for which they have not been compensated, but as I view it they are not entitled to a dollar more, on account of the letter of a hard agreement, which they have obtained by suppression, either willful or negligent.    When the whole transaction is taken up by the four corners and looked at from a broader view, the injustice of allowing the appellants the entire amount for which they ask, seems to me just as apparent as when closely analyzed.    This estate was, as we have seen, a very simple one.    There were no sales of real property and no recovery of money through litigation.    The estate was in process of settlement for eight or nine months, but could have occupied only a few weeks of actual time.    The only money really handled by the defendants was the $41,000 in the bank when Daniel Kunkel died.    By the time this reached Samuel Kunkel it had shrunken in one way and another to about $23,000.    Of this difference the defendants, and their associate Hesse, have absorbed and are attempting to absorb in one way and another, as compensation for their services, the sum of about $9,000. This is no small sum.    It is a moderate fortune.    As much as the average attorney earns in years—more than the average layman accumulates in a lifetime. To my mind this great sum is out of all proportion to the small services performed.    An attorney ought not to expect to get rich off from one client for so little work and in so simple a transaction.    And if he does, his methods in the matter ought to be so fair and open as to be above reproach.    It may be true that there is no absolute standard by which we can measure the value of an attorney's services, as we would a bushel of wheat.    But this is true of personal services in all

walks of life.   It is just as true of the services of an architect or a physician or a mechanic, as it is of a lawyer.   Yet we have to measure the value of such services whenever they come up to us.   We all have an approximate idea of what is reasonable and what is unreasonable, for an attorney's services in any given case.

I concur with that portion of the majority opinion which approves the settlement with Mrs. Kunkel and finds that the defendants acted with entire good faith in that matter.   I also agree that there is nothing to censure in their general management of the estate, except when it touched the fees of themselves and the executors.

It has been suggested that Mr. Kunkel might have approved of defendants' proposed fee, even if he had been informed of the previous one.   It may possibly be true, that in the old man's improvident eagerness to secure a portion of his inheritance, he would have consented, even to that.   We can never know—he is dead and cannot speak—but it is the fault of the defendants that we do not know.   If they had done their duty and informed him of the first fee when they asked for the second, we would have known what his attitude would have been.   It is not in the mouths of the defendants to urge the doubt that results from their own wrong or neglect.   Under such circumstances, as we have already seen, the burden is upon them.

There are a number of reasons why I should like to concur in the majority opinion, if I could see my way clear to do so, without violation of just principles, but I cannot, and I therefore dissent.